**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00281 (JEB)** |
| **v.** | : | |
| | : | |
| **JORDAN REVLETT,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Jordan Revlett ("Revlett") to 30 days' incarceration, followed by 36 months' probation, 60 hours of community service, and $500 restitution.

## I.      Introduction

The defendant, Jordan Revlett, an employee on his family's farm in Island, Kentucky, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.7 million  in losses.[1]

On January 14, 2022, Revlett pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of 30 days' incarceration, with probation to follow, is appropriate in this case because: Revlett (1)

---

[1]      As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

spent more than 30 minutes inside of the Capitol building; (2) traveled to D.C. with his family but chose to enter the Capitol Building alone; (3) took numerous photos and videos using his mobile telephone while in and around the Capitol, including videos inside the Rotunda showing physical altercations between police and rioters, and outside the Capitol building showing rioters perched on top of police vehicles; (4) broadcasted his breach of the Capitol and videos from inside the building via the social media platform, Snapchat; (5) while inside the Rotunda, obtained a bullhorn and used it to make statements of unknown content and joined in chants with other rioters against the police; (6) falsely claimed to the FBI that he was invited into the Capitol by United States Capitol Police Officers; (7) repeated that lie to his social media followers; and (8) has yet to express meaningful remorse for his conduct on January 6.

The Court must also consider that Revlett's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed to halt the Congressional certification vote.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers.  The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).  Here, Revlett's participation in a riot that actually succeeded in halting the Congressional certification combined with Revlett's extended presence inside the Capitol building renders a meaningful restriction on liberty, beyond probation or home detention, both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021, Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.

### *Jordan Revlett's Role in the January 6, 2021, Attack on the Capitol*

On January 5, 2021, Jordan Revlett and his parents drove from their home in Island, Kentucky, to Washington, D.C., to attend the "Stop the Steal" rally.  The Revlett family listened to President Trump's speech, then marched to the Capitol.  At some point before he entered the Capitol building, Jordan Revlett separated from his parents.

Revlett recorded videos on his phone as the family approached the Capitol building from Pennsylvania Avenue and, later, on the West Lawn.  Revlett recorded videos on his cell phone as he ascended the Northwest Stairs.  Exhibit 1 is a video taken near the Northwest Scaffolding, and includes a caption inside a grey bar, indicating that the video was recorded and captioned using Snapchat.  The video shows rioters packed shoulder to shoulder under the Northwest Scaffolding and, as Revlett pans up toward the Capitol building, on the stairs.  The caption reads: "Honestly, holy shit."  Exhibit 2 appears to have been recorded further up the stairs, around 2:33p.m., according to the metadata from Revlett's cellphone.



*Exhibit 1A (left) – Screenshot from Exhibit 1 showing NW Scaffolding and crowd of rioters;*

*Exhibit 2A (below) – Screenshot from Exhibit 2, showing crowd approaching Capitol building on NW stairs*



Revlett entered the U.S. Capitol building without his parents at approximately 2:35 p.m., through the Upper West Terrace Door.  He recorded his entry and posted it to his Snapchat

"story."[2]  He continued to record video while inside the Capitol and to post video to his Snapchat story, which was visible to his followers.[3]

Revlett claimed—both in a pre-arrest interview and in a Snapchat that he posted to his story—that police officers let him into the building.  Exhibit 3A, below, shows a screen capture of Revlett's January 6 Snapchat story, including the caption:  "Just so you guys know a capitol police officer opened the door from the inside to let us in."



*Exhibit 3A – a screen capture from Jordan Revlett's January 6 Snapchat story*

---

[2]     A video capture of Revlett's January 6 Snapchat story has been marked as "Exhibit 3" and made available to the Court and defense counsel via USAfx.

[3]     The government obtained this video capture of Revlett's Snapchat story from one of his Snapchat followers.  The government is not aware of how many followers Revlett had, or how many people saw his story or snaps on January 6.

In the Snapchat video that Revlett recorded depicting his entry into the building, police are visible off in the distance on the Upper West Terrace, but none are visible near the Upper West Terrace Door where Revlett was recording and would enter the building:



*Exhibit 3B – shows Revlett recording near the Upper West Terrace Door, a group of Metropolitan Police are visible off in the distance, circled in blue.*



*Exhibit 3C – moments later, Revlett has panned away from the group of police and is facing the Upper West Terrace Door.  No police are visible in this shot.*

Further, CCTV shows that, at approximately 2:33 p.m., Capitol Police were trying to get rioters to *leave* through the Upper West Terrace door:



*Exhibit 4A – Camera 0126 "Upper West Terrace" at apx. 2:33:40 p.m., Capitol Police officer circled in blue*

As rioters exited that exterior door, however, more rioters began to pour in. Capitol Police briefly tried to block those individuals from progressing further into the building:



*Exhibit 4B – Camera 0126 "Upper West Terrace" at apx. 2:34:43 p.m., Capitol Police officers circled in blue*

7

By the time Revlett entered the building, Capitol Police were neither guarding the exterior door, nor blocking the interior passageway.



*Exhibit 4C – Camera 0126 "Upper West Terrace" at apx. 2:35:17 p.m., Jordan Revlett circled in red*

A different angle showing the Upper West Terrace Door from the inside shows no police near the door at the time when Revlett entered or at any time preceding his or other rioters' entry through that door; certainly no police are visible opening the door from the inside:



*Exhibit 5 – Camera 0912 at apx. 2:35:03 p.m.*

Revlett spent approximately 32 minutes inside the U.S. Capitol building.  He spent the bulk of his time in the Capitol Rotunda:



*Exhibit 6 – Camera 0960 "Rotunda North" at apx. 2:44:25 p.m., Revlett highlighted by the red box*

At one point, Revlett acquired a bullhorn from a fellow rioter and began making unknown announcements in the Rotunda:



*Exhibit 7 – Camera 0950 "Rotunda South" at apx. 2:45:45 p.m.*

Revlett left the Rotunda around 2:54 p.m., wandering away from the crowd, appearing to explore other areas:



*Exhibit 8 – Camera 0686 "Rotunda Door Interior" at apx. 2:55:44 p.m.*



*Exhibit 9 – Camera 0751 at 2:55:55 p.m. – House-side fire door, second floor (same floor as Rotunda)*

Revlett returned to the Rotunda around 2:56 p.m.  While in the Rotunda, Revlett filmed a rioter shoving police, and vis-versa.  Rioters can be heard shouting expletives at police in that video.[4]



*Exhibit 10A – screenshot from Exhibit 10, video recorded on Revlett's cellphone showing altercation between a rioter and a Metropolitan Police officer*

Revlett remained in the Rotunda until Capitol and Metropolitan Police began to clear that area en mass around 3:05 p.m.

---

[4]     This video, recovered from Revlett's cellphone, has been marked as "Exhibit 10" and submitted to the Court and defense via USAfx.



*Exhibit 11A – Camera 0959 "Rotunda South" at apx. 3:05:32 p.m. – Revlett appears to watch police forming a line*



*Exhibit 11B – Camera 0959 "Rotunda South" – Revlett edges toward the Rotunda Door as a large number of Metropolitan Police Officers (indicated by blue arrow) enter the Rotunda*



*Exhibit 11C – Camera 0959 "Rotunda South" at apx. 3:06:28 p.m. – Revlett exits the Rotunda*

Revlett made his way to the East Rotunda Door and exited the Capitol building at about 3:07:30 p.m. as a crowd of rioters was pushed out of the Rotunda by Capitol and Metropolitan Police, behind him.



*Exhibit 12 – Camera 0686 "Rotunda Door Interior" at apx. 3:06:50 p.m.*

Revlett recorded videos on his phone from the east side of the Capitol building after he exited, showing rioters standing on tactical vehicles and trying to get into the building via the East Rotunda Door.[5]

 

| *Exhibit 13A – screenshot of Exhibit 13, recorded on Revlett's cellphone at 3:09 p.m., following Revlett's exit from the Capitol building* | *Exhibit 14A – screenshot of Exhibit 14, recorded on Revlett's cellphone at 3:11 p.m., following Revlett's exit from the Capitol building* |

*Social Media Posts*

Revlett recorded and posted videos to his Snapchat story on January 6, which was visible to his followers on Snapchat.  In one video, Revlett was outside of the Capitol building on the

---

[5]     These videos were recovered from Revlett's cellphone and do not appear to have been posted to social media.  These two videos have been marked as Exhibits 13 and 14 and made available to the Court and defense counsel via USAfx.

Upper West Terrace.  Revlett panned first to his right and then to his left.  On the right, many Metropolitan Police Officers were visible, standing approximately 100 feet away on the House side of the Capitol building.  On the left, hundreds of rioters were visible covering the Upper West Terrace and the top of the Inaugural scaffolding.  As Revlett approached the Upper West Terrace door, two voices exclaimed, "We're in the fucking Capitol" and "holy shit!" respectively.  The second voice, saying "holy shit," appears to be Revlett's voice.  Alarms—a high-pitched, continuous beeping, similar to a smoke alarm—blared in the background as Revlett passed through the Upper West Terrace Door.

In another video, Revlett appeared to be in the Small House Rotunda.  Rioters can be heard chanting, "Let us through! Let us through!"  Revlett zoomed in across the Small House Rotunda, focusing on a small line of Capitol Police blocking rioters' passage to corridors on the other side of the Small House Rotunda, including a corridor leading to the Senate chamber.  As it is recording, the phone bounced rhythmically, suggesting that Revlett is also chanting "let us through," though his voice cannot be distinguished from the others echoing in the Small House Rotunda.

After he left the Capitol, Revlett posted a "selfie" to his Snapchat story, apparently from the back seat of a car, and included the caption, "Just so you guys know a capitol police officer opened the door from inside to let us in."[6]

*Jordan Revlett's Interview*

On January 15, 2021, prior to his arrest, Jordan Revlett voluntarily gave statements to the FBI at his family's farm in Island, Kentucky.  Revlett's father, Rodney Revlett, was also present at the time.  Jordan Revlett was shown the screen capture of his Snapchat story, and he admitted

---

[6]     Each of the posts discussed in this section (the two videos and the selfie) are combined in Exhibit 3, which is the video capture of Revlett's January 6 Snapchat story.

to having recorded and posted the videos.  Jordan repeated his claim that a police officer opened the door that he entered from the inside, made eye contact, and nodded at him as he went inside, "like nothing was wrong."  In this January 15 conversation, Rodney Revlett did the bulk of the talking; Jordan said very little.  Both Revletts claimed that they were not aware that Congress was in session when the riot started.

<em>The Charges and Plea Agreement</em>

On January 20, 2021, Jordan Revlett was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On April 6, 2021, Jordan Revlett was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On January 14, 2022, Revlett pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building.  By plea agreement, Revlett agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Jordan Revlett now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, Revlett faces up to six months of imprisonment and a fine of up to $5,000.  Revlett must also pay restitution under the terms of his plea agreement.[7]  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it.  18 U.S.C. § 3559; U.S.S.G. §1B1.9.

---

[7]    Revlett's plea agreement incorrectly stated that a term of supervised release of not more than one year applies to violations of 40 U.S.C. § 5104(e)(2)(G).  As violations of 40 U.S.C. § 5104(e)(2)(G) are "petty offenses," supervised release does not apply.  18 U.S.C. § 3583(b)(3).

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while looking at Revlett's individual conduct, this Court should look to a number of critical aggravating and mitigating factors, to include: (1) whether, when, how he

entered the Capitol building; (2) whether he encouraged violence; (3) whether he encouraged property destruction; (4) his reaction to acts of violence or destruction; (5) whether during or after the riot, he destroyed evidence; (6) the length of his time inside of the building, and exactly where he traveled; (7) his statements in person or on social media; (8) whether he cooperated with, or ignored commands from law enforcement officials; and (9) whether he has demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Revlett personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on Revlett's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Revlett from most other misdemeanor defendants.

Jordan Revlett entered the U.S. Capitol at approximately 2:35 p.m., twenty minutes after the initial breach, through the Upper West Terrace Door, which is located in the center of the West Side of the building.  He recorded videos on his cell phone near the media tower on the West Front and as he ascended the Northwest Stairs towards the Upper West Terrace.  Though these videos do not show violence, based on the time and locations that these videos were recorded, Revlett would have been very near dozens of rioters engaged in hand-to-hand combat with the police on the West Front, and would have seen and heard nonlethal crowd suppression ordinances—such as OC spray[8] and flashbangs—being deployed.  What *is* visible and audible in these videos is the hordes of rioters around Revlett, and the deafening roar of the crowd.

---

[8]     OC spray, more commonly known as "pepper spray," is a type of chemical irritant which was deployed by police on the West Front on January 6 along with other nonlethal crowd-suppression techniques.

Contrary to Revlett's statements to the FBI, there were multiple red flags that should have deterred him from entering the building, including the high-pitched alarm screeching in his Snapchat video as he walks through the Upper West Terrace Door.  Revlett's insistence that a Capitol Police officer opened that door and let him and other rioters inside and/or made eye contact and nodded at Revlett as he entered is completely unsupported both by CCTV capturing that door from multiple angles, and Revlett's own video.  Rather, the door was opened by other rioters exiting the building, and then held open by rioters entering the building.

Revlett's time in the building is also significant.  For over 30 minutes, CCTV shows him in no great hurry to leave.  Though he spent most of his time wandering around the Rotunda, he did split off from the crowd and walked down a little-trafficked interior hallway and poked his head through a fire door before returning to the Rotunda.

Revlett remained in the Capitol building despite encountering police in multiple locations. Revlett encountered police in the Small House Rotunda, who were blocking access to Senate-side corridors while rioters chanted, "Let us through!"  Revlett encountered police in the Great Rotunda, one of whom he filmed in a physical altercation with a rioter.  Revlett stood and watched police flood into the Rotunda around 3:05 p.m., and only then did he make his way to an exit.  He continued recording rioters outside pushing against the East Rotunda Doors and standing on vehicles.

Revlett also has yet to express meaningful contrition for his conduct on January 6.  To the contrary, in his January 15 statements to the FBI, Revlett claimed that he did nothing wrong and entered the Capitol after being invited in by Capitol Police.  In statements to the PSR writer, Revlett accepted responsibility for being inside the Capitol without authorization, but persisted in his claim that he received encouragement from Capitol Police while inside.  Revlett also claimed that, "after

about 15 minutes, he received a notification (alert)" on his phone regarding the breach of the

Capitol and, thereafter, he "came to his senses and decided to abandon the U.S. Capitol grounds."

These statements are not supported either by CCTV, which show him inside the Capitol for over

30 minutes and leaving only when large numbers of police began to clear the Rotunda, or by the

videos on Revlett's phone, which show him lingering inside the restricted area on the East Side of

the Capitol building, recording the riot on the outside of the Capitol building.

Accordingly, the nature and the circumstances of this offense establish the clear need for a

sentence of incarceration in this matter.

### B.  Revlett's History and Characteristics

As set forth in the PSR, Jordan Revlett has no criminal history.  Revlett was 22 years old

when he breached the Capitol on January 6, and he still lives with and works for his parents on the

family's farm.  As of his most recent pretrial compliance report, Revlett missed two phone check-

ins with pretrial services.  (ECF No. 32.)

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The

violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and

appalling disregard for our institutions of government and the orderly administration of the

democratic process."[9]  As with the nature and circumstances of the offense, this factor supports a

sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the

January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21

---

[9]      Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have

recognized, democracy requires the cooperation of the citizenry.  Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society.  Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Jordan Revlett's statement to the PSR writer, pre-arrest statements to FBI, and statements on social media clearly demonstrate the need for specific deterrence for this defendant.  It appears that Revlett has yet to come to terms with the gravity of the riot or of his own role in it.  The government acknowledges that Revlett has accepted responsibility by entering a guilty plea.  On the other hand, Revlett continues to perpetuate the myth that Capitol Police were allowing rioters to enter and remain in the building, and he has yet to retract this claim.  This self-serving statement, even if reflective of Revlett's genuine belief, is troubling, especially when video evidence—including Revlett's *own video*—so soundly dispels the myth.  Both specific and general deterrence demand a sentence of incarceration to impress upon Revlett the true seriousness of his conduct, and to show the public that no rioter was an invited tourist on January 6.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[10]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes.  A probationary sentence should not necessarily become the default.[11]  Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be."  *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not

---

[10]     Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[11]     Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF),  and  *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF).  The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

going to be.'  And I agree with that.  Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders.  Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment.  Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration.  Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Revlett has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor.  18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir.

2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators.  In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006).  "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences.").  In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).  *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").  Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity.  *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007).  The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims.  Thus, even though many of the defendants

were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent.  The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the United States has generally recommended, and judges have often imposed, jail time in cases where the defendant witnessed confrontations with police officers or refused to follow the officers' orders.  *See, e.g.*, *United States v. Register*, 1:21-cr-00349 (TJK) (75 days' incarceration where the defendant waved the crowd towards an access point, entered the U.S. Capitol past broken windows and ignored officers' attempts to clear him and others from the building); *United States v. Frank Scavo*, 1:21-cr-254 (RCL) (60 days' incarceration where the defendant witnessed the violent breach of the East Rotunda Doors); *United States v. James Little*, 1:21-cr-315 (RCL) (60 days' incarceration and 36 months' probation where the defendant witnessed rioters clashing with police officers on the Capitol Grounds); *United States v. William Tryon*, 1:21-cr-00420 (RBW) (50 days' incarceration where the defendant disregarded directions by police officers and remained inside the Capitol until he was forced to leave).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Caplinger,* No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case"); *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Sarko*, 21-cr-591 (CKK), ECF 37 (D.D.C. April 29, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence).  In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10); *United States v. Hemphill*, 21-cr-555(RCL), ECF 40 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510(CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence).

### A. A sentence imposed for a petty offense may include both incarceration and probation.

#### 1. Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[12] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[13] As a general matter, therefore, "a judge must sentence a federal offender to either a

---

[12]   A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10). *See* Part II *infra*.

[13]   Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

### 2. *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617

F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at

\*4.  But that limitation "does not extend" to a defendant sentenced to a petty offense.  *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense."  *See Little*, 2022 WL 768685, at \*5-\*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense").  Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."  The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated

phrase "the same or a different offense."  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012).  Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49.  And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."  *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants.  *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b).  *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific

statute will not be controlled or nullified by a general one.").  As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, *supra*, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented."  *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail."  *Id.* at 185.  "The 'specific provision'—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers."  *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section

3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.   Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).   *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense.   For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.   *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).   Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).   Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).   No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.   The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.   *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d

1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

> **B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

> ### *1. Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[14]

> ### *A. Analysis*

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3563(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period"

---

[14]    Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[15]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation.   18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539.   Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.   Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.   In any event, the government does not advocate a sentence that includes imprisonment as a term of probation in the defendant's case given the requested 30-day imprisonment sentence.

---

[15]     Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison.  Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

**VI.      Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors.  As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence.  Balancing these factors, the government recommends that this Court sentence Jordan Revlett to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.


Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      _____
Kathryn E. Fifield
Trial Attorney
U.S. Department of Justice, Crim. Div.
Detailed to the D.C. U.S. Attorney's Office
601 D Street, N.W.
Washington, D.C.  20530
(202) 320-0048
Kathryn.fifield@usdoj.gov